UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SANY AMERICA INC.,

               Plaintiff,

     v.

THE G.W. VAN KEPPEL
COMPANY,

             Defendant.

CIVIL ACTION NO.
1:23-CV-03532-JPB

**<u>ORDER</u>**

This matter is before the Court on the parties' cross-motions for summary

judgment [Docs. 86 and 87].  This Court finds as follows:

**PROCEDURAL HISTORY**

This case arises from a dispute between a franchisor and a franchisee.  Sany

America Inc. ("Sany") filed this action against The G.W. Van Keppel Company

("Van Keppel") on August 7, 2023, alleging breach of contract.  [Doc. 1].  Sany

contends that Van Keppel breached its contractual obligations under a Settlement

Agreement that the parties executed on May 1, 2019.  Van Keppel filed a

counterclaim on October 19, 2023.  [Doc. 17].  In the Second Amended

Counterclaim, which was filed on December 8, 2023, Van Keppel claims that Sany

violated the Arkansas Franchise Practices Act ("the AFPA") when it terminated the

parties' franchise relationship without good cause and without the proper notice and opportunity to cure. [Doc. 36, p. 9].

Both parties moved for summary judgment on June 19, 2024. [Doc. 86]; [Doc. 87]. The motions are ripe for review.[1]

## BACKGROUND

The Court derives the facts of this case from both parties' Statement of Material Facts, Statement of Additional Material Facts and the responses filed thereto. The Court also conducted its own review of the record.[2]

Sany is a heavy machinery manufacturer. [Doc. 96, p. 2]. Van Keppel is a multi-line heavy machinery dealer. Id. In 2012 or 2013, Van Keppel became an

---

[1] Sany filed a Motion for Leave to File Sur-Reply on August 9, 2024. [Doc. 107]. Given the extensive briefing filed in this case, the Court does not believe that a sur-reply is necessary. Consequently, the motion is **DENIED**.

[2] The Local Rules state that the Court "will deem each of the movant's facts as admitted unless the respondent: (i) directly refutes the movant's fact with concise responses supported by specific citations to evidence (including page or paragraph number); (ii) states a valid objection to the admissibility of the movant's fact; or (iii) points out that the movant's citation does not support the movant's fact or that the movant's fact is not material or otherwise has failed to comply with the provisions set out in LR 56.1(B)(1)." LR 56.1B(2)(a)(2). In this case, Sany's responses to Van Keppel's facts often failed to comply with the Local Rules because the responses were not concise. In one instance, Sany filed a multi-page response to a fact. [Doc. 94-5, pp. 6–9]. These types of argumentative factual responses belong in the briefing. The Court further notes that the manner in which the parties presented their briefing was complicated to review. Oftentimes, they incorporated arguments that they had made in other documents, which required additional effort for the Court. In the future, the parties are encouraged to condense the briefing into one document when possible.

authorized dealer of Sany products, and the parties established a franchisor–

franchisee relationship.  Id.

      In 2018, a dispute arose between the parties, which they were able to resolve

through the execution of a Settlement Agreement and a new Dealer Agreement

(together, "Settlement Agreement").[3]  Id.  The relevant portions of the Settlement

Agreement are as follows:

- Sections 7, 8 and 9:  These provisions required Van Keppel to meet or exceed a 3% market share for two different classes of excavators (medium excavators and mini excavators) and use all reasonable efforts to obtain a 7% market share for the medium excavators by 2023.[4]

- Section 13:  Under this provision, Van Keppel was required to purchase Sany branded signage within four months.

- Section 5.1:  This provision contained two components.  First, Van Keppel was required to "effectively promote and sell Sany products so as to achieve market penetration . . . satisfactory to Sany."  And second, the provision required Van Keppel to "employ, train and maintain competent sales . . . personnel to promote and sell Sany products."

---

[3] By way of background, the dispute involved Sany's first attempt to terminate the franchise relationship.  After Sany attempted to terminate the franchise agreement, Van Keppel filed a lawsuit alleging that Sany lacked good cause to terminate the relationship. Van Keppel also argued that Sany failed to provide sufficient notice and opportunity to cure.  [Doc. 96, p. 2].

[4] Market share is calculated by dividing the total sales of excavators made by a dealer in a given period by the total excavator sales in the Area of Primary Responsibility during the same time period.  [Doc. 96, p. 4].

- ▪ Section 5.2:  This provision governed service and repairs.  The provision required Van Keppel to provide "prompt, courteous and expert services to Sany customers" and to perform warranty repairs regardless of who initially sold the Sany product.

Id. at 3–4.

From 2019 until 2021, Van Keppel had one general sales manager and three salespersons.  [Doc. 96, p. 11].  Van Keppel added an additional salesperson in 2021.  Id.  According to Sany, Kelly Russell, who was Van Keppel's regional sales manager, was ineffective because he would "never answer his phone.  He was not a helpful person[,] . . . [and] he was more worried about partying . . . than selling." Id.  Sany also asserted that Michael Burns, a salesperson, was a "weaker [salesperson] on the construction side" and "didn't perform that well."  Id. at 11–12.

It is undisputed that in 2019, Van Keppel failed to meet the 3% market share requirement for the mini excavators.  [Doc. 87-1, p. 23].  It is also uncontroverted that Van Keppel fell short of the market share requirements for both classes of excavators in 2020 and 2021.  Id.  Moreover, the undisputed evidence demonstrated that Van Keppel failed to purchase the required signage.  [Doc. 86-15, pp. 133–34] (deposition testimony where Van Keppel's representative admitted that exterior signage was never purchased).

On September 7, 2021, Sany's CEO visited Van Keppel's Little Rock location to express his concerns about Van Keppel's poor performance pursuant to the Settlement Agreement.  [Doc. 103, p. 2].  Because Van Keppel wanted to continue working with Sany, Sany suggested "creating and putting in place an action plan that would help [the parties] jointly achieve higher market penetration."  Id.

The parties met to discuss the action plan on November 15, 2021.  Id. at 3.  The parties dispute, however, whether they were able to come to an agreement concerning the action plan and what the exact agreement was.  Indeed, Van Keppel contends that the parties agreed that Van Keppel, in the short-term, would try to achieve a 3% market share of excavators, with no distinction between the sizes.  [Doc. 95-3, p. 3].  Sany, on the other hand, asserts that the 3% market share was still required for both classes of excavators.  Id.  For the long-term, the parties seemed to agree that the ultimate goal was for Van Keppel to obtain a 6% market share.  [Doc. 87-3, p. 2].  Although Sany maintains that the parties failed to reach an agreement regarding the action plan, one of Sany's employees who attended the meeting wrote this in an email:  "[w]hile the current situation is far from perfect, we now have [a] concrete goal post of [3%] market share for 2022.  We either

achieve better results together or go our separate ways.  We believe that this is a good outcome."  [Doc. 88-3, p. 2].

After the action plan meeting, Van Keppel continued to sell excavators.  For December 2021, the parties dispute both how many excavators that Van Keppel sold and whether Van Keppel sold enough to exceed the market share requirements.  [Doc. 94-5, p. 10].  Similarly, the parties also disagree concerning the number of excavators sold and whether the market share requirements were met in the period from January 2022 to June 2022.  Id. at 11–14.  Despite Sany's arguments to the contrary, Van Keppel ultimately contends that it sold enough excavators to exceed the 3% requirement in the months following the action plan meeting.

On June 2, 2022, Sany notified Van Keppel via a letter that it was terminating Van Keppel as a dealer (the "Termination Letter").  [Doc. 86-35, p. 2]. The Termination Letter did not explicitly state that Van Keppel had an opportunity to cure and stated that the termination was effective on June 30, 2022, "in order to allow for an orderly wind-down and transition of the relationship."  [Doc. 86-35, p. 3].  The Termination Letter explained that Van Keppel failed to meet the market share requirements in 2019 through 2021 and failed to effectively promote and sell Sany products.  Id. at 2–3.  The Termination Letter also noted that Van Keppel

failed to adhere to its service commitments, including sending employees to training conducted by Sany.  Id. at 3.

The Termination Letter never mentioned any of Van Keppel's sales in 2022 or whether it was currently satisfying the market share requirements.  While Sany contends that those numbers were not mentioned because they were not relevant, the Termination Letter did state that "Sany has worked diligently with Van Keppel in an effort to assist Van Keppel with developing an action plan to improve the performance issues . . . .  However, in spite of these efforts, Van Keppel continues to show no signs of improvement, leaving Sany with no reasonable choice other than to terminate the Dealer Agreement."  [Doc. 94-5, p. 15]; [Doc. 86-35, p. 3].

As stated above, the Termination Letter provided that the termination would be effective on June 30, 2022.  Although the termination date was June 30, 2022, it is undisputed that Van Keppel completed a $1.7 million sale of Sany equipment on August 26, 2022.  [Doc. 96, p. 14].  Indeed, Van Keppel continued ordering and selling Sany products through November 2022.  Id.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A material fact is

any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997). A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Allen, 121 F.3d at 646 (citation omitted).

The party moving for summary judgment bears the initial burden of showing that no genuine issue exists as to any material fact, "and in deciding whether the movant has met this burden[,] the court must view the movant's evidence and all factual inferences arising from it in the light most favorable to the nonmoving party." Id. After the movant satisfies this initial burden, the nonmovant bears the burden of showing specific facts that indicate summary judgment is improper because a material issue of fact does exist. Id. However, "[a] mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted). If the record taken

as a whole cannot lead "a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (citation omitted).

## DISCUSSION

Two claims are at issue in this suit:  Sany's for breach of contract and Van Keppel's for violation of the AFPA.  The Court will first address the breach of contract claim.

## I.    <u>Sany's Breach of Contract Claim</u>

In its breach of contract claim, Sany asserts that Van Keppel breached the Settlement Agreement when Van Keppel failed, among other things, to meet the market share requirements in 2019 through 2021.  Van Keppel does not meaningfully dispute that it failed to meet those market share requirements. Instead, Van Keppel argues that Sany's breach of contract claim fails because the November 2021 action plan modified the Settlement Agreement.  Alternatively, Van Keppel asserts that even if the November 2021 action plan was not a binding modification, Sany waived its right to enforce the market share requirements in 2019 through 2021.

### A. Choice of Law

Before analyzing the breach of contract claim, the Court must first determine which body of law applies to this case.  A federal court sitting in diversity jurisdiction applies state substantive law and federal procedural law.  <u>Royalty Network, Inc. v. Harris</u>, 756 F.3d 1351, 1357 (11th Cir. 2014).  "In diversity cases, the choice-of-law rules of the forum state determine what law governs" a given claim.  <u>Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.</u>, 704 F.3d 927, 932 (11th Cir. 2013).  In Georgia,

> [u]nder the rule of lex loci contractus, the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply.

<u>Calhoun v. Cullum's Lumber Mill, Inc.</u>, 545 S.E.2d 41, 44 (Ga. Ct. App. 2001) (quoting <u>Lloyd v. Prudential Sec.</u>, 438 S.E.2d 703, 704 (Ga. Ct. App. 1993)).  The rule above, however, is subject to an exception.  Indeed, "the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes. When no statute is involved, Georgia courts apply the common law as developed in Georgia rather than foreign case law."  <u>Citizens Ins. Co. v. Banyan Tree Mgmt., LLC</u>, 631 F. Supp. 3d 1256, 1275 (N.D. Ga. 2022).

The Court recognizes that the Settlement Agreement was made in Georgia and was to be performed in Arkansas.  Thus, under the general rule, Arkansas law would apply.  However, the parties have not identified any such statute that is involved in Sany's breach of contract claim.  Accordingly, the Court will apply Georgia's common law because the application of another jurisdiction's laws is limited to statutes and decisions construing those statutes.[5]

## B. Threshold Issues

In addition to addressing choice of law, the Court must decide two threshold issues.  In the briefing, Van Keppel argues that the AFPA precludes Sany, as the franchisor, from bringing a breach of contract claim.  Van Keppel reasons that because the AFPA expressly authorizes franchisees to recover damages for a franchisor's violation of the AFPA but provides no such corresponding rights to franchisors, a breach of contract claim requesting damages is forbidden.  Stated differently, Van Keppel asserts that the Arkansas Legislature must have intended to displace the common law breach of contract rules for franchise agreements.  Based on the arguments presented, the Court is not willing to find that the Arkansas Legislature intended to displace Arkansas contract law in its entirety.

---

[5] As to contract interpretation and principles, the law in both Georgia and Arkansas is similar.  Thus, even if Arkansas law applied, the result here would remain unchanged.

While it may be true that Sany is precluded from bringing a claim for damages under the AFPA, nothing in the statute indicates that claims outside of the statute are prohibited.  As such, the Court finds that the AFPA does not prevent Sany from bringing a breach of contract claim.[6]

Van Keppel additionally argues that the Settlement Agreement prevents Sany from seeking damages.  The Court does not agree.  The Settlement Agreement states that

> [n]either Sany nor [Van Keppel] shall be liable to the other for any damages allegedly caused by the termination of this Agreement, including but not limited to damages based upon loss of anticipated sales or prospective profits, expenditures, investments, leases, property improvements or other matters related to the business of the parties.

[Doc. 40-1, p. 19].  A plain reading of this provision shows that the precluded damages are only those damages *caused by* the termination itself.  Sany's damages resulting from Van Keppel's failure to meet the market share requirements in 2019 through 2021 were not caused by the termination.  Thus, the Court finds that this provision does not limit Sany's damages.

---

[6] Van Keppel does not cite any cases to support its argument that either the AFPA or other similar franchise statutes across the nation preclude a franchisor from bringing a breach of contract claim.

### C. Merits

As stated previously, Van Keppel does not dispute that it breached the Settlement Agreement by failing to satisfy the market share requirements. Instead, Van Keppel argues that Sany's breach of contract claim fails because the November 2021 action plan modified the Settlement Agreement. Alternatively, Van Keppel asserts that Sany waived its right to enforce the market share requirements in 2019 through 2021. The Court will first address whether the action plan created a new contract by modifying the Settlement Agreement.

### 1. November 2021 Action Plan

For two reasons, the Court is not persuaded that the action plan modified the Settlement Agreement and became a binding contract. First, the Settlement Agreement contained a provision pertaining to modifications. That provision provided that "[t]his Agreement shall not be amended, modified, varied or supplemented except in a writing signed by duly authorized representatives of each of the parties." [Doc. 40-1, p. 4]. Here, Van Keppel points to an email chain between the parties. [Doc. 94-12, p. 2]. The first email was sent by Sany to Van Keppel on November 22, 2021, and titled "Meeting Follow Up." Id. The email purported to send a "summary to lay out our collective approach to the goals [the parties] established in [the] meeting." Id. On December 14, 2021, Van Keppel

responded to the email with commentary about each of the goals in the original email.  Id.  Construing the evidence in the light most favorable to Van Keppel, the email correspondence following the meeting does not constitute a signed agreement between the parties demonstrating an intent to enter into a binding modification of the Settlement Agreement.  In the Court's view, a reasonable jury could not conclude that the parties intended to depart from the Settlement Agreement through these informal emails.

Even if the emails discussing the action plan constituted a new contract between the parties, the action plan was not supported by new consideration. Under Georgia law, a written contract may be modified by a subsequent agreement.  Importantly, however, "a modification must be founded upon new consideration."  Carroll v. Bd. of Regents of Univ. Sys. of Ga., 751 S.E.2d 421, 425 (Ga. Ct. App. 2013).[7]  Here, Van Keppel argues that the parties' mutual promises are sufficient consideration.  The Court disagrees.  In fact,

> [a]lthough mutual promises may be adequate consideration to
> uphold a contract, the promise must have value to the party
> agreeing to the change; if no benefit is received by the obligee

---

[7] The law is the same in Arkansas.  "The weight of authority is that a subsequent agreement that purports to modify or change an existing agreement must be supported by consideration other than the consideration involved in the existing agreement.  Where there is no new consideration presented for the bargained for item, 'the new agreement is void and of no effect for lack of mutuality of consideration.'"  Worden v. Crow, 427 S.W.3d 143, 147–48 (Ark. Ct. App. 2013).

> except what [it] was entitled to under the original contract, and
> the other party to the contract parts with nothing except what [it]
> was already bound for, there is no consideration for the
> additional contract.

Youree v. Eshaghoff, 256 S.W.3d 551, 555 (Ark. Ct. App. 2007).

The record, which includes testimony from the action plan meeting and the emails following the meeting, does not point to any new consideration Sany would receive in return for modifying the Settlement Agreement.  Here, the action plan shows, at most, that Van Keppel promised to do no more than what it was already obligated to do.[8]  Ultimately, because the action plan was not a writing signed by both parties and because it was not supported by new consideration, Van Keppel's argument that the action plan represented a new contractual arrangement between the parties' fails.

### 2.  Waiver

Van Keppel contends that "[e]ven if the 2021 Action Plan was not a modification of the Settlement Agreement, common law waiver and estoppel principles would still bar Sany's breach of contract claim for underperformance in 2019–2021."  [Doc. 87-1, p. 23].  Van Keppel seems to argue that Sany cannot

---

[8] Under Van Keppel's version of events, the action plan called for Van Keppel to obtain a 3% market share across all excavators.  The action plan also set forth a goal of a 6% market share in the future.  These requirements are less than the conditions in the Settlement Agreement.

retrospectively insist on strict performance because the AFPA requires that the dealer be given an opportunity to cure, "and Van Keppel clearly cannot, in 2022, cure its market share performance in 2019, 2020, or 2021." Id.  Van Keppel also asserts that "once Sany allowed Van Keppel, despite its breaches, to 'proceed with the performance of the contract,' it waived its right to seek damages for those prior breaches." [Doc. 102, p. 14].

"It is true that a party to a contract 'may waive a contractual right, and that any such waiver may be accomplished expressly or implicitly through the party's conduct.'" J.P. Carey Enters., Inc. v. Cuentas, Inc., 864 S.E.2d 588, 598 (Ga. Ct. App. 2021).  Waiver, however, is not favored under the law, and the law will not "infer the waiver of an important contract right unless the waiver is clear and unmistakable." Id.  In short, to show waiver, "all of the attendant facts, taken together, 'must amount to an intentional relinquishment of a known right.'" Id. While the standard is high, "[i]f there is conflicting evidence over whether a waiver occurred, the issue is for a jury to resolve." DJ Mortg., LLC v. Synovus Bank, 750 S.E.2d 797, 807 (Ga. Ct. App. 2013).

Conflicting evidence exists over whether a waiver occurred in this case. While the record shows that Van Keppel failed to maintain the required market share for both 2019 and 2020, Sany did not seek a termination in either 2019 or

2020.  Instead, Sany allowed Van Keppel to continue performing pursuant to the

contract.  Moreover, Sany chose to work with Van Keppel in an effort to improve

the situation.  Notably, Sany even acknowledged in an email after the action plan

meeting that going forward, the parties would either achieve better results together

or go their separate ways.  Under these facts and especially after considering the

timing (Sany waited more than two years to enforce the 2019 market share

requirement), the Court finds that the jury must decide whether Sany waived its

contractual rights.  Because a genuine issue of material fact exists as to whether

Sany waived its contractual rights under the Settlement Agreement, neither party is

entitled to summary judgment as to the breach of contract claim.  Both motions are

thus **DENIED**.[9]

---

[9] Without providing any additional argument or support, Van Keppel also asserts that
Sany is estopped from bringing a breach of contract claim.  Because this argument is not
supported either factually or legally, the Court does not have an obligation to consider it.
Brewfab, LLC v. 3 Delta, Inc., 580 F. Supp. 3d 1201, 1208 (M.D. Fla. 2022) (holding
that courts need not consider cursory arguments that are not supported); see also Maples
v. Campbell, No. 5:03-CV-2399, 2006 WL 8438017, at *17 (N.D. Ala. Sept. 29, 2006)
(finding that the court was not required to "consider unsupported and undeveloped
issues").  The Court thus declines to consider Van Keppel's unsupported estoppel
defense.

## II.    Van Keppel's AFPA Claim

The AFPA provides that a franchisor cannot "[t]erminate or cancel a franchise without good cause."  A.C.A. § 4-72-204.  The AFPA further states that a franchisor must give notice and an opportunity to cure when terminating a franchise.

In this case, Van Keppel asserts that Sany violated the AFPA when it terminated the parties' franchise relationship without good cause, without adequate notice and without an opportunity to cure.  Both parties argue that they are entitled to summary judgment as to this claim.

### A. Good Cause

As stated above, the AFPA prohibits a franchisor from terminating a franchise without good cause.  Particularly relevant here, the AFPA defines good cause as follows:

> (A) Failure by a franchisee to comply substantially with the requirements imposed upon him or her by the franchisor, or sought to be imposed by the franchisor, which requirements are not discriminatory as compared with the requirements imposed on other similarly situated franchisees, either by their terms or in the manner of their enforcement; and

> (B) The failure by the franchisee to act in good faith and in a commercially reasonable manner in carrying out the terms of the franchise.

A.C.A. § 4-72-202(5).

Sany contends that it "plainly had good cause to terminate Van Keppel" because Van Keppel failed to comply substantially with the requirements imposed in the Settlement Agreement.  [Doc. 86-1, p. 17].  More specifically, Sany asserts that "there is no genuine dispute of material fact that Van Keppel failed to meet the 3% market share thresholds in the Settlement Agreement."  Id.  Sany further argues that "there are no 'similarly situated franchisees' to Van Keppel in this context" because Van Keppel was the only Sany dealer operating pursuant to a Settlement Agreement.  Id. at 18.  In response, Van Keppel concedes that it failed to meet the market share requirements in 2019, 2020 and 2021 and does not address whether the relevant requirements were discriminatory as compared with other similarly situated franchises.  Van Keppel nevertheless argues that Sany lacked good cause because the action plan modified the Settlement Agreement.  Ultimately, Van Keppel asserts that "[t]he AFPA does not allow a franchisor to modify the terms of a dealer agreement, terms the dealer relies on and performs under, and then let the franchisor pull the rug out from under the dealer by reverting . . . to the previous terms as justification for termination."  [Doc. 87-1, p. 17].

For the reasons explained previously, the action plan did not modify the Settlement Agreement.  See supra § I.C.1.  As such, the Settlement Agreement was the operative contract between the parties.  Because it is undisputed that Van

Keppel failed to meet the market share goals set forth in the Settlement Agreement for 2019, 2020 and 2021, Sany has demonstrated that it had good cause to terminate the franchise.[10]

**B.  Notice and Opportunity to Cure**

Under the AFPA, a franchisor cannot terminate a franchise "without first giving written notice to the franchisee at least ninety (90) days in advance of such action, setting forth the reasons for the termination."  A.C.A. § 4-72-204(b).  In addition to the notice requirement, the franchisor "shall provide the franchisee with thirty (30) days in which to rectify any claimed deficiency."  Id.  If, however, the termination is for "repeated deficiencies within a twelve-month period giving rise to good cause," "the franchisee shall have ten (10) days to rectify the repeated deficiencies."  A.C.A. § 4-72-204(d).

In this case, it is undisputed that Sany sent the Termination Letter on June 2, 2022, and indicated that the termination would be effective on June 30, 2022.  It is also uncontroverted that Van Keppel completed a $1.7 million sale of Sany equipment on August 26, 2022—85 days after the Termination Letter.  [Doc. 96, p.

---

[10] Because the Court finds that Sany had good cause to terminate the franchise based on Van Keppel's failure to meet the market share requirements, the Court need not analyze whether Sany also had good cause for Van Keppel's alleged bad faith.  The Court notes that Van Keppel's waiver argument was only raised as a defense to Sany's breach of contract claim.

14].  Indeed, Van Keppel continued ordering and selling Sany products through November 2022.  Id.

Sany first argues that it is entitled to summary judgment because it complied with the reduced notice period of ten days.  The reduced period applies when repeated deficiencies within a twelve-month period have been identified.  The Court finds that whether the ten-day reduced notice period applies is a jury issue. Although Sany argues that Van Keppel was terminated for "repeated deficiencies" within a twelve-month period, on numerous occasions throughout the brief, Sany argued that the market share requirements were yearly requirements—not monthly or quarterly requirements.[11]  In the Court's view, if the market share requirements were merely yearly requirements, Van Keppel could not have been in violation of those requirements numerous times within a twelve-month period.  It is conceivable that Van Keppel could satisfy the entirely yearly requirement in one month of sales.

Although it is undisputed that the Termination Letter only gave Van Keppel twenty-eight days' notice of the termination, Sany nevertheless argues that it

---

[11] Sany made this argument at least seventeen times.  See e.g. [Doc. 94-5, p. 11] (stating that the "[m]arket share in the Settlement Agreement was calculated on an annual basis" and denying a fact as immaterial because "the market share requirement was calculated on an annual basis, meaning the period between January and May 2022 is irrelevant").

complied with the longer notice requirements because "Van Keppel was ordering new Sany products as late as September 8, 2022 (98 days after the termination notice) [and] continued selling Sany products through November 2022 (at least 152 days after the termination notice)." [Doc. 86-1, p. 23].

The Court finds that a genuine issue of material fact exists as to whether Sany gave the required notice and opportunity to cure. Although there is evidence that Van Keppel maintained the ability to order and sell Sany products beyond the ninety-day period,[12] the Court cannot ignore the termination date on the Termination Letter. The Court also cannot discount that the Settlement Agreement specifically contemplated that transactions could occur after termination. The Settlement Agreement stated that "[i]n the event that Sany and [Van Keppel] have any dealings after termination of this Agreement, such dealings shall not be construed as a renewal of this Agreement or as a waiver of such termination, but

---

[12] Contrary to Sany's argument, Larry Hobbs does not fully support its argument here. Larry Hobbs Farm Equip., Inc. v. CNH Am., LLC, No. 2:08CV00049, 2008 WL 3931323, at *3 (E.D. Ark. Aug. 22, 2008). In Larry Hobbs, no explicit termination date was on the letter. Id. Instead, the letter stated that the plaintiff could no longer order goods after a certain date. Id. In deciding a motion to dismiss, the court found that the plaintiff plausibly alleged a violation of the AFPA because the deadline for the plaintiff to order goods was less than ninety days after notice was provided. Id. Importantly, the court never held that the deadline for ordering goods was the deciding factor as to when termination occurred. Id. Unlike the defendant in Larry Hobbs, Sany expressly stated that termination was effective on June 30, 2022.

such dealings shall be conducted according to terms identical to the provisions of this Agreement." [Doc. 40-1, p. 19]. In short, because the Termination Letter only provided Van Keppel with twenty-eight days' notice instead of ninety, the Court finds that summary judgment is improper. To the extent that either party argues that summary judgment is appropriate as to Plaintiff's AFPA claim, the motions are **DENIED**.[13]

## CONCLUSION

For the foregoing reasons, the pending Motions for Summary Judgment [Docs. 86 and 87] are **DENIED**. The parties are **HEREBY ORDERED** to file the Consolidated Pretrial Order required by Local Rule 16.4 within twenty-one days of entry of this Order. The parties are notified that a failure to comply with this Order may result in sanctions, including dismissal of the case or entry of default judgment. If a Consolidated Pretrial Order is not filed, the Clerk is **DIRECTED** to submit the case at the expiration of the twenty-one-day period.

---

[13] The Court agrees with Sany that Van Keppel's damages for violation of the notice and opportunity to cure requirements are limited. Indeed, Van Keppel is only permitted to recover damages for the ninety-day notice period. Larry Hobbs, 2008 WL 3931323, at *3. Thus, Van Keppel's damages are limited to those that it suffered between June 30, 2022 (the date that Van Keppel contends the agreement was terminated), and August 31, 2022 (ninety days after the notice of termination).

If the parties would like a stay of this deadline to allow them to conduct mediation, they may file a motion to that effect.[14]  The parties are reminded that the Court can refer this case to mediation before a Magistrate Judge at no cost.  If the parties would like such a referral, they may make such a request in the motion.

**SO ORDERED** this 6th day of March, 2025.

_____
**J. P. BOULEE**
United States District Judge

---

[14] The Court recognizes that the parties indicated in their Joint Preliminary Report and Discovery Plan that there was "[n]o possibility of settlement."  [Doc. 30].  While the Court will not force the parties to mediate their dispute, it appears that mediation could be helpful here.